EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
KATHARINE SCHONBACHLER
Assistant United States Attorney
Asset Forfeiture Section
California Bar No. 222875
        Federal Courthouse, 14th Floor
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-3172
        Facsimile: (213) 894-7177
        E-mail: Katie.Schonbachler@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| UNITED STATES OF AMERICA, | No. CV 15-07149 |
|---|---|
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | [18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984] |
| $175,121.75 IN WELLS FARGO BANK FUNDS, | |
| Defendant. | [D.E.A.] |

        The United States of America brings this claim against defendant $175,121.75 in Wells Fargo Bank Funds (the "defendant bank funds"), and alleges as follows:

**JURISDICTION AND VENUE**

        1.      This is a civil forfeiture action brought pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and 984.

        2.      This Court has jurisdiction over the subject matter under 28 U.S.C. §§

1345 and 1355.

3.      Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

PERSONS AND ENTITIES

4.      The plaintiff is the United States of America.

5.      The defendant is $175,121.75 in bank funds seized from a Wells Fargo Bank account with the last four digits 6662, held in the name of Matador Group, Inc. (the "Matador Account") on June 6, 2012, pursuant to a federal seizure warrant. The defendant bank funds were seized at Wells Fargo Bank located at 535 N. Brand Ave., Glendale, CA.

6.      The defendant bank funds are in the custody of the United States Marshals Service in this District, where they shall remain subject to this court's jurisdiction during the pendency of this action.

7.      The interests of the Matador Group, Inc. ("Matador"), Oscar Guel ("O. Guel") and Jocelyn Sarmiento Guel ("J. Guel") may be adversely affected by these proceedings.

**EVIDENCE SUPPORTING FORFEITURE**

*Background of the Investigation*

8.      In approximately April 2010, agents with the Drug Enforcement Administration ("DEA") Los Angeles Field Division's Financial Investigations Group ("LAFD-FIG") (hereinafter referred to as "agent" or "agents") initiated an investigation, Operation Rush Hour, targeting high-level money launderers connected to Joaquin "El Chapo" Guzman-Loera aka Chapo ("Chapo") and other members and associates of the Sinaloa Drug Cartel ("the Organization"). During this investigation, agents obtained and developed intelligence from many sources, including open source and private commercial databases, other federal, state and local law enforcement investigations, confidential sources and cooperating individuals, undercover operations, wiretaps and pen registers, subpoenas and witness interviews. This intelligence revealed the following:

2

a.   the Organization's drug trafficking and financial operations were compartmentalized;

b.   the financial operations in Mexico were directed by a group of money brokers who were provided information on drug proceeds to be picked up and laundered by counterparts engaged in the drug trafficking operations (the undercover portion of Operation Rush Hour involved picking up drug proceeds and laundering them at the direction of these money brokers);

c.   each of the money brokers identified in this investigation had multiple "clients" involved in drug trafficking operations. These clients collectively represented drug cells operating throughout the United States, Canada, Europe and Asia that generated millions of dollars in drug trafficking proceeds every week;

d.   the money brokers used an array of bank accounts in Mexico, Asia, Central and South America and the United States to launder drug proceeds; and

e.   one of the accounts into which the money brokers directed undercover agents and officers to deposit the collected drug proceeds was the Matador Account from which the defendant $175,121.75 in Wells Fargo Bank Funds were seized.  Between February 10, 2012 and June 1, 2012, a total of $626,260.00 in drug proceeds was wire transferred to the Matador Account pursuant to the money brokers' instructions, as discussed in greater detail below.

9.   In or around October 2011, an undercover agent ("UC1") successfully infiltrated the Organization and began coordinating directly with the Mexico-based money brokers, including Cuauthemoc Quintero-Angulo aka Cheto ("Cheto") and Marco

3

Ivan Zaragoza-Pelayo, aka Julio ("Julio").[1]  UC1 posed as a Colombian money laundering organization's primary representative in the United States and Canada, claiming he had subordinates in several states and regions throughout the world. UC1 represented that, due to his position, all transactions were to be coordinated by him, even though he might later assign a subordinate to complete the transaction.

10.    At a meeting in Panama on or about October 28, 2010, UC1 was introduced to Cheto by a cooperating source. During that meeting, Cheto and UC1 discussed Cheto's operations and UC1 learned that Cheto was connected with Julio and other high-level money brokers.

11.    During the Panama meeting, UC1 asked Cheto whether Cheto worked on behalf of the Zetas drug trafficking organization or on behalf of the "short guy."  Cheto asked whether UC1 was referring to Chapo, and UC1 confirmed that he was.  Cheto stated that 90% of Cheto's business came from Chapo's organization.  Cheto also stated that he knew Ismael "El Mayo" Zambada, the head of the Zambada drug trafficking organization and a leader within the Sinaloa Drug Cartel, and Juan Jose Esparragoza Moreno (aka El Azul), a leader within the Sinaloa Drug Cartel.

12.    Cheto's statements to UC1 that he and the other money brokers were connected with Chapo and the Organization were consistent with statements made at other times to UC1 by Julio.

13.    On October 29, 2011, UC1 met again with Cheto, this time to discuss international drug trafficking.  During the meeting, UC1 stated that his organization could transport large loads of cocaine from Panama to the United States and other ports throughout the world.  Cheto told UC1 that he had customers who could use such

---

[1]  On September 7, 2012, the grand jury returned an indictment in United States v. Zaragoza-Pelayo et al., Case No. 12-CR-853 in the Central District of California.  The named defendants in that case, including Julio, were arrested in Mexico and the United States is currently seeking their extradition.  Agents learned that Cheto was murdered in his home in Tijuana, Mexico in May 2012.

services, and Cheto and UC1 discussed prices and logistical details. Cheto asked whether UC1 could arrange transportation from Colombia to Miami, Florida. UC1 responded that UC1 did not know but could find out.

14.     After Cheto had directed a series of successful undercover drug proceeds pick-ups by Undercover Officers (the "UCs"), Cheto in January 2012 agreed to introduce UC1 and two other UCs to Julio, and a meeting was held on January 11, 2012 in Panama City, Panama. At that meeting, Julio stated that he worked on behalf of Chapo and other drug traffickers operating from Mexico. Julio stated that he engaged in drug trafficking and money laundering, and moved drugs to Atlanta, Georgia. In later conversations with UC1, Julio stated that he also moved drugs to Canada.

15.     In March 2012, Julio asked UC1 whether UC1 could pick up a large quantity of currency in the United States and deliver it to Costa Rica. In furtherance of that request, LAFD-FIG personnel later picked up $240,000.00 in drug proceeds and processed it for transportation to Costa Rica.

16.     On March 15, 2012, UC1 and another LAFD-FIG UC met with Julio in San José, Costa Rica to deliver the $240,000.00. This was designed to be a test run to meet Julio's need to have bulk currency picked up and delivered to Costa Rica. As discussed below, UC1 picked up additional drug proceeds on several more occasions from Julio, who would provide bank account numbers to the UCs for them to wire the funds into those bank accounts.

*Overview of the Narcotics Money Laundering Scheme*

17.     The Rush Hour narcotics money laundering scheme followed the same general process for each transaction: When a high-level drug trafficker had drug proceeds that needed to be picked up, laundered and transferred to Mexico, the high level drug trafficker would contact a money broker such as Julio. The broker would then contact UC1 to coordinate the pickup of the currency and provide the details of the transaction, i.e. the location and amount of the currency pick-up, and a name and telephone number for the money broker's representative or money courier responsible

for delivering the drug proceeds.

18.    UC1 or another UC would then contact the money broker's representative or money courier to coordinate the money pick-up.  The UCs would then coordinate and meet the money couriers in a shopping mall parking lot or similar location somewhere in the United States to pick up the drug proceeds.  The money would then be deposited into a DEA undercover bank account at City National Bank in the name of a fictitious business, Bebig Industries ("Bebig").  This account and other undercover accounts ("DEA Bebig Accounts") were then used to wire - - at Julio's direction - - funds to various individual and business bank accounts, including the Matador Account.  UC1 would report the amount of the picked up proceeds to the money brokers involved.  Julio or another money broker would then instruct UC1 to wire the money to bank accounts of specific individuals and businesses in the United States and Mexico.  Specifically, Julio would provide the account numbers to UC1 and the amount to transfer to each account.

19.    During the investigation, UC1 had numerous conversations with Cheto and Julio during which it was made clear that the proceeds being picked up by the undercover operation were derived from drug trafficking.

### Summary of Drug Proceeds Transfers To The Matador Account

20.    The Matador Account was one of the accounts identified by the money brokers as an account into which drug proceeds were to be deposited.  The signatories on the Matador Account are Oscar Guel and Jocelyn Guel.

21.    Between February 2012 and May 2012, Julio and Julio's co-conspirators arranged several drug proceeds pick-ups with the UCs, including six pickups totaling just over $1,155,854, $626,260 of which Julio directed UCs to wire into the Matador Account.  Below is a summary of the six money pick-ups:

      a.    On February 8, 2012, agents coordinated the money pick-up of $96,970 from an unidentified male on behalf of Julio.  On February 10, 2012, Cheto provided UC1 with wiring instructions to send $94,060 to the Matador Account.  On or about February 10, 2012,

6

$94,060.00 was wired from a DEA Bebig Account to the Matador Account.

b.   On March 29, 2012, Julio contacted UC1 and requested a money pick-up to be conducted in Los Angeles area for approximately $140,000.  On March 30, 2012, a UC picked up $140,000 from Javier Verdugo Miranda in San Dimas, California.  On March 31, 2012, Julio provided UC1 with wiring instructions to send $137,200 to the Matador Account.  On or about April 2, 2012, $137,200.00 was wired from a DEA Bebig Account to the Matador Account.

c.   On April 26, 2012, Julio contacted UC1 and requested a money pick-up to be conducted in Los Angeles for approximately $196,000.  On April 27, 2012, a UC picked up $195,600 from Jose Roberto Hernandez in Montebello, California. Julio instructed UC1 to send $45,000 to the Matador Account.  On or about May 1, 2012, $45,000 was wired from a DEA Bebig Account to the Matador Account.

d.   On May 14, 2012, Julio contacted UC1 and requested a money pick-up be conducted in Columbus, Ohio for approximately $145,000. The Los Angeles based agents coordinated this pick-up with agents in the DEA's Columbus Residence Office.  On May 17, 2012, a Columbus-based UC picked up for $144,955 from two unidentified males.  On May 22, 2012, Julio instructed UC1 to send $136,257 to the Matador Account.  On or about May 23, 2012, $136,257 was wired from a DEA Bebig Account to the Matador Account.

e.   On May 17, 2012, Carlos Diaz ("Diaz") contacted UC1 on behalf of Julio and requested that a money pick-up be conducted in Philadelphia, Pennsylvania for approximately $80,000.  The Los Angeles based agents coordinated this money pick-up with the DEA's Philadelphia Field Division ("PFD"), and on May 21, 2012, a

7

PFD UC conducted a money pick-up in Philadelphia from Diaz.  On May 23, 2012, Julio instructs UC1 to send $63,743 to the Matador Account.  On or about May 24, 2012, $63,743 was wired transferred from a DEA Bebig Account to the Matador Account.

    f.    On May 23, 2012, Gabriel Hernandez-Ramirez on  behalf of Julio contacted UC1 and requested that a money pick-up be conducted in Cincinnati, Ohio for approximately $150,000.  The Los Angeles based agents coordinated this money pick-up with  the DEA's Cincinnati Residence Office, and on May 25, 2012 a Cincinnati UC picked up $498,329 from David Alexander and Masai Williams in Cincinnati.  On May 29, 2012, Julio instructed UC1 to send $150,000 to the Matador Account.  On or about May 30, 2012, $150,000 was wired from a DEA Bebig Account to the Matador Account.

    22.    In sum, Julio and Julio's co-conspirators directed the UCs to deposit a total of $626,260 into the Matador Account between February - May 2012.  On June 6, 2012, pursuant to a federal seizure warrant, the defendant $175,121.75 in Wells Fargo Bank Funds was seized from the Matador Account, which was the balance of the account at the time of seizure.

<u>FIRST CLAIM FOR RELIEF</u>

    23.    Plaintiff alleges that the defendant bank funds represent or are traceable to proceeds of one or more exchanges of a controlled substance or illegal narcotic trafficking or were intended to be used in one or more exchanges for a controlled substance in violation of 21 U.S.C. § 841 et seq.  The defendant bank funds are therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) (governing proceeds and intent to use in narcotic trafficking violations) and 18 U.S.C. § 981(a)(1)(C) (governing proceeds of specified unlawful activity, including drug trafficking).  To the extent that the defendant bank funds seized from the Matador Account are not the actual monies directly traceable to the illegal activity identified herein, plaintiff alleges that the

8

1  defendant bank funds are identical property found in the same account(s) as the property

2  involved in the specified offenses, rendering them subject to forfeiture pursuant to 18

3  U.S.C. § 984.

SECOND CLAIM FOR RELIEF

4

5        24.     Plaintiff further alleges that the defendant bank funds are subject to

6  forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 984 because

7  they were involved in one or more violations of 18 U.S.C. §§ 1956 (money laundering)

8  and 1957 (transactions in criminally-derived proceeds).

9        WHEREFORE, plaintiff United States of America prays that:

10       (a)     due process issue to enforce the forfeiture of the defendant bank funds;

11       (b)     due notice be given to all interested parties to appear and show cause why

12  forfeiture should not be decreed;

13       (c)     this Court decree forfeiture of the defendant bank funds to the United States

14  of America for disposition according to law; and

15       (d)     for such other and further relief as this Court may deem just and proper,

16  together with the costs and disbursements of this action.

17  Dated: September 10, 2015            Respectfully submitted,

18                                       EILEEN M. DECKER
                                         United States Attorney
19                                       LAWRENCE S. MIDDLETON
                                         Assistant United States Attorney
20                                       Chief, Civil Division
                                         STEVEN R. WELK
21                                       Assistant United States Attorney
                                         Chief, Asset Forfeiture Section
22
                                         KATHARINE SCHONBACHLER
23                                       Assistant United States Attorney

24                                       Attorneys for Plaintiff
                                         United States of America
25

26

27

28

9

1

<u>VERIFICATION</u>

2

I, Theodore C. Russell, hereby declare that:

3

1.      I am a Special Agent with the Drug Enforcement Administration and am the

4

case agent for the forfeiture matter entitled <u>United States of America v. $175,121.75 in</u>

5

<u>Wells Fargo Bank Funds</u>.

6

2.      I have read the above Verified Complaint for Forfeiture and know its

7

contents.  It is based upon my own personal knowledge and reports provided to me by

8

other law enforcement agents.

9

3.      Everything contained in the Complaint is true and correct, to the best of my

10

knowledge and belief.

11

I declare under penalty of perjury that the foregoing is true and correct.

12

Executed September 3, 2015 in Los Angeles, California.

13

14

_____

15

Theodore C. Russell

16

17

18

19

20

21

22

23

24

25

26

27

28